## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CHARLES PIKE, derivatively on behalf of MIMEDX GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PARKER H. PETIT, MICHAEL J. SENKEN, WILLIAM TAYLOR, CHARLES E. KOOB, BRUCE L. HACK, LARRY W. PAPASAN, JOSEPH G. BLESER, J. TERRY DEWBERRY, JOHN E. CRANSTON, NEIL S. YESTON, CHARLES R. EVANS, and LUIS A. AGUILAR,<br><br>Defendants,<br><br>and<br><br>MIMEDX GROUP, INC.,<br><br>Nominal Defendant. | Civil Action No.:_____<br><br><br><br><br><br><br><br><br><br><u>**JURY TRIAL DEMANDED**</u> |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Charles Pike ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant MiMedx Group, Inc. ("MiMedx" or the "Company") against the Individual Defendants (defined herein) seeking to remedy their breaches of fiduciary duties from March 7, 2013 to the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes, without limitation: (a) review and analysis of public filings made by MiMedx with the United States

Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by MiMedx; (c) review of news articles, stockholder communications, and postings on MiMedx's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from a related pending securities fraud class action captioned, *In Re MiMedx Group, Inc. Securities Litigation* No. 1:18cv830 (N.D. Ga.) (the "Securities Class Action"); and (e) review of other publicly available information concerning MiMedx and the defendants.

## NATURE OF THE ACTION

1.      MiMedx is a biopharmaceutical company that develops and markets regenerative biologics utilizing human placental tissue allografts with patent-protected processes for various sectors of healthcare. It processes the human placental tissue utilizing its proprietary PURION Process to produce allografts.

2.      The Company utilizes several different distributors to deliver its products. Among those distributors is AvKARE, Inc. ("AvKARE") – a federal contractor. Through MiMedx's distribution agreement with AvKARE, the Company was able to order certain products for delivery to Department of Veterans Affairs ("VA") hospitals at will. The revenues derived from MiMedx's distribution agreement with AvKARE made up a significant portion of the Company's total revenues. In 2013, for example, 56% of the Company's total revenues were attributable to its agreement with AvKARE.

3.      In December 2016, two former employees of MiMedx filed a complaint against the Company, alleging, among other things, retaliatory termination by MiMedx after reporting fraudulent revenue recognition practices (the "Whistleblower Action"). In particular, the Whistleblower Action alleged that MiMedx had engaged in a "channel-stuffing scheme" to

"fraudulently recognize revenue [purportedly earned under its distribution agreement with AvKARE] in its certified financial statements before the revenue had been realized or realizable and earned." The Company denied those claims and, in fact, sued the employees for tortious interference, among other things.

4. In connection with the Whistleblower Action, on December 27, 2016, the Company announced that the Audit Committee of the Board had "advised the Company's management and the Board of Directors that it has found no credible evidence to indicate that any changes to previously issued financial statements are necessary in light of these allegations."

5. On March 1, 2017, the Company announced that the Audit Committee had completed its investigation, which purportedly (i) "confirmed there is no credible evidence of any wrongdoing on behalf of members of MiMedx management," and (ii) "determined that the Company has appropriately recognized revenue and found no credible evidence to indicate that any changes to the Company's previously issued financial statements are necessary in light of the former employees' allegations."

6. However, in September 2017 several market research analysts (often called "short reporters") published reports which, among other things, focused on the fraudulent revenue recognition practices of MiMedx alleged in the Whistleblower Action. Again, MiMedx denied these allegations and sued each of the research companies for, among other things, libel, slander, and defamation.

7. On February 20, 2018, after causing the Company to expend monies in the foregoing litigation and publicly denying that MiMedx was engaged in an improper revenue scheme, MiMedx disclosed an "internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company," and with regard

to "the accounting treatment of certain distributor contracts." The Company further announced that, because of this internal investigation, it would delay the release of its fourth quarter and fiscal year 2017 financial results.

8.      On June 7, 2018, MiMedx announced that its previously issued consolidated financial statements relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015, and 2016 and each of the interim periods ended March 31, June 30 and September 30, 2017 should be restated. The Company further announced "the determination of the need to restate was based on investigation results to date, which have primarily been focused on the accounting treatment afforded to such sales and distribution practices for two distributors for which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods."

9.      In connection therewith, the Department of Justice ("DOJ") launched an investigation into MiMedx's distribution practices, including allegations of channel stuffing. This was already on top of the Company having admitted that it was cooperating with an SEC investigation into how the Company recognizes revenue.

10.      Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by knowingly or recklessly disregarding the inadequate lack of controls and deficiencies in the Company's accounting and financial reporting systems and allowing the Company and its employees to engage in a "channel-stuffing" scheme to improperly recognize revenue and violations of the Physician Payments Sunshine Act ("PPSA"), as described herein.

11.      Additionally, the Individual Defendants caused the Company to make false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants made false and/or

misleading statements and/or failed to disclose that (i) MiMedx was engaged in a "channel-stuffing" scheme designed to inappropriately recognize revenue that had not yet been realized; (ii) the Company lacked adequate internal controls over financial reporting; and (iii) that as a result of the foregoing, MiMedx's publicly disseminated financial statements were materially false and misleading.

12.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, MiMedx has sustained damages as described below.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is  not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     This Court has personal jurisdiction over each of the defendants because each of the defendants is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District under 28 U.S.C. § 1391(a) because the Company is incorporated in the State of Florida, does business in this District, and many of the acts charged herein, occurred in substantial part in this District.

## PARTIES

16.     Plaintiff is a current shareholder of MiMedx common stock. Plaintiff has

continuously held MiMedx common stock at all relevant times. Plaintiff is a citizen of Michigan.

17.     Nominal defendant MiMedx is a Florida corporation, with its principal executive offices at 1775 West Oak Commons Ct. NE, Marietta, GA 30062. MiMedx is a biopharmaceutical company developing and marketing regenerative and therapeutic biologics utilizing human placental tissue allografts.

18.     Defendant Charles R. Evans ("Evans") is the former Chairman of the Board and has served as a director of the Company since September 2012. In addition, defendant Evans served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Evans is a citizen of Georgia.

19.     Defendant Parker Petit ("Petit") served as the Company's CEO and Chairman of the Board from February 2009 until his resignation in June 2018, as the Company's President from February 2009 until September 2009, and as director of the Company from February 2009 until September 2018. On September 20, 2018, the Company announced that the Board had changed Petit's resignation to "termination for cause." Upon information and belief, defendant Petit is a citizen of Georgia.

20.     Defendant Michael J. Senken ("Senken") served as the Company's Chief Financial Officer ("CFO") from January 2010 until his resignation in June 2018. Upon information and belief, defendant Senken is a citizen of Georgia.

21.     Defendant John E. Cranston ("Cranston") served as Treasurer, Corporate Controller and Vice-President of MiMedx until his resignation in June 2018. On September 20, 2018, the Company announced that the Board had changed Cranston's resignation to "termination for cause." Upon information and belief, defendant Cranston is a citizen of Georgia.

22.     Defendant Joseph G. Bleser ("Bleser") served as a director of the Company from

September 2009 until June 2019. In addition, defendant Bleser served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Bleser is a citizen of Georgia.

23.     Defendant J. Terry Dewberry ("Dewberry") served as a director of the Company from September 2009 until June 2019. In addition, defendant Dewberry served as the Chairman of the Audit Committee during the Relevant Period. Upon information and belief, defendant Dewberry is a citizen of Georgia.

24.     Defendant Bruce L. Hack ("Hack") served as a director of the Company from December 2009 to June 2019. Upon information and belief, defendant Hack is a citizen of New York.

25.     Defendant Charles E. Koob ("Koob") has served as a director of the Company since March 2008. Upon information and belief, defendant Koob is a citizen of Wyoming.

26.     Defendant Larry W. Papasan ("Papasan") served as a director of the Company from March 2008 to June 2019. Upon information and belief, defendant Papasan is a citizen of Tennessee.

27.     Defendant Neil S. Yeston ("Yeston") has served as a director of the Company since September 2012. Upon information and belief, defendant Yeston is a citizen of Connecticut.

28.     Defendant William C. Taylor ("Taylor") served as a director of the Company from October 2011 until his resignation in June 2018 and as the Company's President and Chief Operating Officer ("COO") from September 2009 until his resignation in June 2018. On September 20, 2018, the Company announced that the Board had changed Taylor's resignation to "termination for cause." Upon information and belief, defendant Taylor is a citizen of Georgia

29.     Defendant Luis A. Aguilar ("Aguilar") served as a director of the Company since

7

from March 2017 to September 2019. Upon information and belief, defendant Aguilar is a citizen of Georgia.

30.     Collectively, defendants Petit, Taylor, Senken, Cranston, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Yeston and Aguilar shall be referred to herein as the "Individual Defendants."

31.     Collectively, defendants Bleser, Dewberry and Evans shall be referred to as the "Audit Committee Defendants."

<b>THE INDIVIDUAL DEFENDANTS' DUTIES</b>

32.     By reason of their positions as officers, directors, and/or fiduciaries of MiMedx and because of their ability to control the business and corporate affairs of MiMedx, the Individual Defendants owed MiMedx and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage MiMedx in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MiMedx and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to MiMedx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MiMedx, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with MiMedx, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

34.     To discharge their duties, the officers and directors of MiMedx were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of MiMedx were required to, among other things:

a)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b)  conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

35.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of

serious injury to the Company.

36.    Additionally, under the Audit Committee Charter, defendants Bleser, Dewberry

and Evans, as Audit Committee members during the Relevant Period were required, *inter alia*, to:

a) Oversee and monitor the activities of Company management with respect  to the Company's accounting and financial reporting processes;

b) Review the proposed scope and plan of the annual audits of the financial statements and internal control over financial reporting;

c) Review and discuss with management the Company's annual audited financial statements, quarterly financial statements and any Company financial statements contained in other periodic reports filed with the SEC;

d) Review with management, before release, the Company's audited financial statements and Management's Discussion and Analysis included in the Company's Annual Report on Form 10-K and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K;

e) Review with management the adequacy of the Company's internal financial controls and reporting systems;

f) Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters;

g) Establish procedures for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

h) Conduct an annual review of the Audit Committee's performance, annually review and reassess the adequacy of this Charter and make recommendations to the Board with respect to any changes in this Charter;

i) Establish and review reporting procedures for accounting matters; and

j) Review compliance, information security, and risk assessment reports from management.

37.    MiMedx has also adopted a "Code of Business Conduct and Ethics" (the "Code")

which applied to the Individual Defendants. The Code states, *inter alia*:

1.1  The Board of Directors of MiMedx Group, Inc. (together with its subsidiaries, the

"Company") has adopted this Code of Business Conduct and Ethics (the "Code") in order to promote:

a) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;

b) full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

c) compliance with applicable governmental laws, rules and regulations;

d) the prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

e) accountability for adherence to the Code.

1.2 The Code applies to all employees, officers and directors of the Company (collectively referred to herein as the "Covered Persons", and each, individually a "Covered Person"). This Code is intended to be supplemented by the Company's more detailed compliance plans and policies, including the Company's Corporate Compliance and Ethics Plan and Reporting Procedures for Accounting Matters.

2. Honest and Ethical Conduct.

2.1 The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.

2.2 The Company's continued success and reputation are dependent upon each Covered Person adhering to the highest ethical and legal standards of business conduct. Each Covered Person must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

\*\*\*

4. Compliance with Laws. The Company's policy is to operate its businesses in strict compliance with all laws and regulatory requirements. Under no circumstances shall a Covered Person take any action on behalf of the Company that he or she knows or reasonably should know violates any applicable law or regulation. Every Covered Person is expected to be familiar with the basic legal and regulatory requirements that apply to his or her duties on the job. An employee who needs help to understand his or her legal obligations is expected to ask a manager, or higher level executive, the Corporate Compliance Officer, the Human Resources Department, or a Company attorney for instruction or advice.

5. <u>Disclosure.</u> The Company applies the highest ethical standards in its financial and non-financial public reporting and follows all applicable SEC, NASDAQ and other standards and rules regarding reporting. It is of critical importance that all disclosures and announcements made by the Company to security holders or the investment community be accurate and complete, fairly present, in all material respects, the subject matter of the disclosure, and be made on a timely basis. Covered Persons who prepare disclosures or review information that will be included in the Company's filings with the SEC or other government agencies or otherwise disclosed to the public must take this responsibility very seriously. Such Covered Persons must provide information that is relevant, objective, accurate and complete to promote full, fair, accurate, timely and understandable disclosures. Each Covered Person has the responsibility to immediately report to appropriate Company personnel or the Audit Committee any information that he or she becomes aware of that affects disclosures made by the Company. This includes any violations of law or this Code that may warrant disclosure to appropriate government authorities. Requests for information about the Company or its business should be directed to the appropriate departments for response. In general, such requests should be answered only by departments and personnel directly responsible for communicating with the groups making the requests, such as the Chief Financial Officer's office or the Legal Department. Any inquiry about a pending or threatened legal matter or other sensitive issue should be referred to the Legal Department. The Company has designated corporate spokespersons to control the flow of information among the media. No Covered Person other than a designated corporate spokesperson should provide any information about the Company or its business to the media. If a Covered Person receives an inquiry from the media, he or she should ask for the inquirer's contact information and pass the inquiry on to the corporate managers or executives who are trained in such matters.

38.     The Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the following breaches of fiduciary duty.

## SUBSTANTIVE ALLEGATIONS

### COMPANY BACKGROUND AND MIMEDX'S SIGNIFICANT RELATIONSHIP WITH AVKARE

39.     According to its public filings, MiMedx is a developer, processor and marketer of regenerative biomaterial products and bioimplants processed from human placental tissue, skin and bone. The Company is a global supplier of allografts processed from amniotic tissue.

40.     The Individual Defendants acknowledge in the Company's public filings that sales to government accounts, such as the VA, comprise a "significant portion of [MiMedx's] revenues

and accounts receivable."

41.     During the Relevant Period, a significant portion of the Company's sales to government accounts were made through MiMedx's distributor relationship with AvKare, which is a General Services Administration Federal Supply Schedule ("FSS") contractor.

42.     MiMedx and AvKare began their distributor relationship in April 2012 upon the execution of a Product Distribution Agreement ("PDA"). The PDA initially had a three-year term ending in April 2015, but through two amendments was extended through June 30, 2017. In total, the PDA has undergone four amendments. Defendants Taylor or Petit signed the PDA and its amendments.

43.     In 2014, MiMedx applied for and, in early 2015, received its own FSS contract with a term through 2020, which permitted the Company to sell directly to government accounts. The Individual Defendants thereafter disclosed in the Company's public filings that they "intend[ed] to transition all of our Government sales to sales sold directly to Government accounts on the FSS."

44.     Per the Company's public filings, through the end of 2015, sales through AvKare have been responsible for a substantial portion of the Company's total revenues and accounts receivable:

| Year | Percentage of MiMedx total revenue attributable to AvKare | Percentage of MiMedx accounts receivable attributable to AvKare |
|---|---|---|
| 2012 | 40% | 53% |
| 2013 | 56% | 55% |
| 2014 | 34% | 33% |
| 2015 | 24% | 26% |

45.     The Individual Defendants knew of the Company's relationship with AvKare and/or the substantive terms of that relationship due to, *inter alia*: (1) sales through AvKare which

constituted a substantial portion of the Company's total revenues and accounts receivable; (2) the Company's approval of the PDA and/or the amendments thereto which could not have been approved without the Individual Defendants; and (3) the Individual Defendants' decision to apply for the Company's own FSS and transition sales to government accounts away from AvKare.

**THE COMPANY'S CHANNEL-STUFFING SCHEME**

46.     Per the Whistleblower Action, the Individual Defendants knowingly and/or recklessly allowed the Company to engage in an improper revenue recognition scheme for years. The Whistleblower Action and the details of the channel-stuffing scheme were revealed in a *Wall Street Journal* investigative report titled "Highflying Medical Firm, a Help to Wounded Veterans, Falls to Earth," dated July 23, 2018 (the "July 23, 2018 WSJ Article") stating in pertinent part:

> Now MiMedx is nursing its own wounds. In June, the company said an internal investigation had shown that its reported financial results going back to 2012 were no longer reliable and would have to be restated.
>
> Mr. Petit has since resigned. The stock has plunged. Authorities are investigating. An interim CEO who specializes in restructuring troubled businesses is running the company.
>
> A Wall Street Journal review of company emails, court documents and internal complaints, plus interviews with current and former employees, paint a picture of a company seeking to grow at almost any cost.
>
> Several former employees alleged that MiMedx sometimes shipped more skin grafts than had been ordered and booked them as sales, a practice known as channel stuffing.
>
> One former employee said that for some tissue implants, a MiMedx sales representative in California recorded inaccurate dates and surgeons' names and improperly listed recipients as John or Jane Doe.
>
> In February the Journal reported that MiMedx hadn't reported payments made to doctors who use or promote its products, despite a federal law requiring most drug and medical-device makers to disclose payments or gifts to doctors. The company said its products were exempt from the rule.
>
> MiMedx provided employees with a way to report issues that troubled them. Eight

ex-employees said they were fired after they spoke up. The company is known to have sued six former employees, accusing them of violating its policies, such as by selling products from other companies while employed.

In response to a list of questions from the Journal about company practices and employees' criticisms, MiMedx said in a written statement that its board's audit committee is conducting an independent investigation into "certain sales and distribution practices and other matters." It said it is cooperating fully with regulatory agencies. MiMedx said it "is not going to comment on allegations raised by former employees, which are being looked into" by the audit committee.

The Journal sent the same questions to Mr. Petit. He addressed a few specific ones but not most. Referring generally to employee statements, Mr. Petit said by email, "I have previously refuted such statements."

The company responded to some criticisms in the past, confronting short sellers who have mounted an attack on its stock. In a rebuttal it once had on its website, MiMedx said, for instance, that the channel-stuffing allegation came from people who misunderstood its operations or from fired and disgruntled former employees. The rebuttal now is gone from the site. MiMedx said it no longer intends to post responses because of its investigation.

Besides that internal inquiry, MiMedx said earlier this year the Securities and Exchange Commission and the Justice Department were reviewing some of its practices. The Department of Veterans Affairs has said it is looking at MiMedx practices, too.

\*\*\*

MiMedx, based in Marietta, Ga., took off in 2011 after it acquired a seller of placenta-based treatments meant to heal wounds more quickly. The products were lightly regulated and relatively inexpensive to make.

The raw materials come from placentas donated by women who have given birth by caesarean section. The company takes the amniotic membrane—the thin, moist tissue that protects the fetus—and processes it into wound patches or grinds it into a powder that can be applied topically or by injection. MiMedx's amniotic-membrane products are the ones most commonly used by doctors and are generally considered to be safe and of good quality, said Robert Kirsner, director of the University of Miami Hospital Wound Center.

Products made from human tissue didn't need Food and Drug Administration approval for marketing so long as the tissue wasn't significantly altered in processing and performed the same basic function it had in the donor. Last November, however, the FDA said some products of the type MiMedx sells do require agency approval. MiMedx has three years to meet the new guidelines and will have the expense of clinical trials.

Meantime, sales representatives have faced pressure from managers for higher volume, said former employees. That is hardly unique, but MiMedx sales reps told of texts streaming in at the end of every month or quarter.

"What else can u ship by end of month?" said one message to a former employee reviewed by the Journal. "Need all u can put in today up to $100k if possible," it said.

"I still have PTSD from the amount of calls I'd get asking what my numbers were going to be for the month," said Mary Armstrong, a former MiMedx account executive in Texas. She said superiors would tell her "I need you to hit this number."

In one instance, MiMedx sales records show the company recorded a shipment of 135 oversized skin grafts to a Las Vegas plastic surgeon's office, which former employees said is way beyond the 10 or so smaller pieces in a typical physician order. The shipment was recorded at 8 p.m. on Sept. 29, 2016, just before the end of a quarter.

No one in the surgeon's office had ordered the goods, according to a former employee of the office.

The surgeon refused to pay for the grafts, which were billed at about $270,000 and shipped to a FedEx Corp. office for pickup, the former office employee said. A FedEx receipt reviewed by the Journal said the shipment was picked up the next day by someone representing the surgeon. The former surgeon's-office employee said no one from the office collected the goods.

The former employee said that, when shown a security video from the location, he recognized the person who had signed for the pickup as a representative for a company that did business with MiMedx. The former employee said the surgeon chose not to pursue the matter with police.

MiMedx's top executives were asked by the doctor's office about this sequence of events and couldn't satisfactorily explain it, the former surgeon's-office employee said.

The allegation was among those MiMedx told the Journal it wouldn't address because of its internal investigation.

Ms. Armstrong, the former MiMedx account executive, said in 2016 she complained to executives, including Mr. Petit, about what she considered improprieties, such as third-party distributors appearing to overcharge hospitals for MiMedx products.

Mr. Petit told her he would fix the problem, but the activities continued, she said. She said she soon was fired for what the company called performance reasons. A Journal question about Ms. Armstrong was among those Mr. Petit addressed. He said Ms. Armstrong "never told me anything that I recall."

MiMedx said in its written statement it "has taken a number of actions to promote accountability and strengthen oversight, including management's development and implementation of measures to improve MiMedx's accounting, corporate compliance and internal control practices." Last week it named a new chief compliance officer from outside the company.

VA hospitals and clinics were crucial to the company's revenue growth, said former employees. The U.S. government accounted for more than a fifth of MiMedx's revenue, by one analyst's estimate. A spokesman for the VA's Office of the Inspector General declined to comment on MiMedx, citing an investigation by the IG.

Many VA hospitals do business with MiMedx on a consignment basis, meaning the company sends them products and is paid only when the VA uses some of them. Storing voluminous merchandise on VA shelves became a challenge, former MiMedx employees said. "We would find ways to hide it," said one.

An August 2017 email received by regional sales directors said consignment inventory outstanding just in the Southwest region was worth some $34 million. For perspective, that was equal to more than 10% of reported sales companywide in the previous year.

Several former employees said that at times, near the end of a quarter, the company would book as sales some of the goods sent to hospitals on consignment but not yet used.

The FDA requires that details of medical use of human tissue—the donor and the recipient—be recorded. MiMedx documents reviewed by the Journal show that in one hospital, tissue recipients were repeatedly recorded by a sales rep as Jane Doe or John Doe. Also, MiMedx records didn't match the hospital's own records in various ways, such as listing a different doctor and incorrect implant date.

Jennifer R. Scott, a former MiMedx regional sales director, said she saw mislabeling of surgical implants as wound-care uses, which are more highly reimbursed.

She said she was fired after identifying the improprieties to her superiors. Ms. Scott, who is known as Robyn, recently sued MiMedx alleging accounting irregularities under the Sarbanes-Oxley law, seeking damages for lost wages and earning capacity. The company declined to comment on the suit, filed in federal court in Dallas, and didn't answer a question from the Journal about the labeling.

MiMedx says it encourages employees to speak up if they see problems at the company. "Management MiMedx Style," posted on the company website, said Mr. Petit personally oversaw what was called a "Dear Pete" program for lodging complaints, and "no employee will be reprimanded or harassed in any way for using this system."

Some former employees described a different "Dear Pete" experience. In a detailed letter to Mr. Petit and the board in January, Tom Tierney, a former regional sales director for surgical products, cited what he called "a mind-boggling level of sales and accounting irregularities," which he called part of a "win at all cost" company culture.

Just over a week later, he was fired, Mr. Tierney said. He said he was accused of giving company information to outsiders, which he denied.

47.     The Whistleblower Action provided even more detail regarding the channel-stuffing scheme and the cover-up by the Individual Defendants. According to the Whistleblower Action, the former employees submitted a joint report notifying defendants Petit, Taylor, and as well as other "MiMedx upper management," that the Company was perpetrating a channel-stuffing scheme in violation of, among other things, the Sarbanes-Oxley Act ("SOX"). Supplemental reports were submitted on November 4 and 7, 2016.

48.     However, the Individual Defendants not only denied the allegations, but threatened the former employees during a December 12, 2016 meeting at MiMedx headquarters.  Defendant Petit stated to them that they would be "financially hit," that "their families and futures will feel it," and that they would be "hurt professionally and with every possible resource available." The Whistleblower Action also alleges that Petit said that "any other [employees] who did similarly would be dealt with quickly and harshly."

49.     That same day, the former employees were fired from MiMedx.

50.     On December 15, 2016, the Company issued a press release, which quoted Petit stating that the allegations in the Whistleblower Action were "not factual and fallacious" and "at

the point of being ridiculous." Defendant Petit also said that the Company had "submitted the allegations to [the] Board of Directors to thoroughly review the issues."

51.     On December 27, 2016, the Company announced that the Audit Committee, together with "independent counsel" and MiMedx's external auditor Cherry Bekaert LLP ("Cherry Bekaert"), was conducting an investigation into the allegations contained in the Whistleblower Action but the Audit Committee had preliminarily advised "the Company's management and the Board [] that it has found no credible evidence to indicate that any changes to previously issued financial statements are necessary in light of these allegations."

52.     On January 9, 2017, the SEC sent MiMedx a comment letter inquiring into the Company's financial disclosures relating to its arrangement with AvKARE. Specifically, the SEC asked that MiMedx "tell us the significant terms of your agreement with AvKARE, including payment terms and rights of return," as well as the Company's "policies for recognizing revenues for sales to them."

53.     On February 6, 2017, the Company issued a press release disclosing that the Board approved a $10 million increase to the Company's Share Repurchase Program. Defendant Petit stated in the press release, in relevant part:

> MiMedx management is just as frustrated with the volatility of our shares as are our shareholders. We know there are ongoing issues associated with naked short selling in our stock. These naked short selling practices are illegal, and we are continuing to be diligent in bringing to light the perpetrators of these illegal activities. We believe the 'fake allegations and fake news' should be discredited when the Company publishes the key findings of the Report from the Audit Committee and the 2016 audited financial results on February 22nd.

54.     On March 1, 2017, the Company announced that the Audit Committee had completed its investigation and concluded that there was "no merit regarding the allegations of wrongdoing that were made by two former employees against the Company." It was further announced that "[t]he Audit Committee's investigation determined that the Company has

appropriately recognized revenue" and there was "no credible evidence to indicate that any changes to the Company's previously issued financial statements are necessary in light of the former employees' allegations." The announcement concluded by stating that "[t]he Audit Committee's findings have been submitted to and approved by the Company's Board []."

55.     On March 20, 2017, the SEC sent MiMedx another comment letter with over ten questions regarding the Company's financial disclosures relating to its arrangement with AvKARE, as well MiMedx's revenue recognition practices. MiMedx sent a response to that letter, which confidentially attached an Executive Summary of the Audit Committee's findings.

56.     On July 5, 2017, the Company announced that its PDA with AvKARE had expired "as planned," effective June 30, 2017. Defendant Petit stated that "[f]or strategic and financial reasons, we elected to obtain our own FSS contract in 2014." Defendant Taylor stated that the "wind-down" of the AvKARE arrangement was "an extremely tedious process involving the development of detailed project plans."

57.     On August 10, 2017, the Company disclosed that the Company had replaced its accounting firm, Cherry Bekaert, with Ernst & Young LLP ("EY").

58.     In early September, an investigative news company, The Capital Forum, issued a report stating that it had confirmed that "[t]he VA Office of Inspector General (OIG) is conducting an investigation that involves documents related to MiMedx." On September 7, 2017, in response MiMedx issued a press release refuting this allegation stating in relevant part:

> MiMedx has been aware for some time of an ongoing investigation by the Department of Veterans Affairs ("VA") Office of Inspector General, but the Company is <u>not</u> a target of that investigation. The Company is assisting with the investigation as requested by the government. To the extent there has been any innuendo by The Capitol Forum or others that somehow MiMedx is a target, that is simply incorrect based on available information.
>
> (Emphasis in original).

20

59.     On September 20, 2017, two research firms – Aurelius Value and Viceroy Research – published separate reports detailing a number of red flags demonstrating fraudulent activity occurring at the Company. The Aurelius Value report entitled "MiMedx: Flying Too Close To The Sun" summarized its findings as follows:

> We see large undiscounted channel stuffing and kickback risks lurking beneath the surface at MiMedx (NASDAQ: MDXG). This report specifically exposes:
>
> Undisclosed related party transactions and entanglements with distributors, including a key MiMedx distributor that has been controlled by an insider. These relationships are especially problematic because secret ties to distributors have featured prominently in historical channel stuffing schemes.
>
> Detailed allegations that MiMedx's channel stuffing scheme relies on at least three more distributors who have undisclosed special agreements involving millions in discounted product and favorable financing terms as "house accounts". Not only does the alleged scheme now extend significantly beyond the VA, but MiMedx has allegedly manipulated its financials through multiple avenues to hit sales targets.
>
> Documents showing that over 40 podiatrists across the country, including the current President of the American Podiatric Medical Association, received undisclosed membership interests in a MiMedx reseller linked to MiMedx affiliates. The HHS Office of Inspector General has declared physician owned distributors as "inherently suspect" in a special fraud alert.
>
> The research mosaic at MiMedx stirs memories of ArthroCare, a medical device company with a similar revenue recognition policy that inflated sales by "parking" millions in product at distributors before period ends. ArthroCare's fraud relied on a distributor secretly controlled by insiders, which metastasized alongside a scandal involving improper relationships with doctors.

60.     In response to these reports, the Individual Defendants caused MiMedx to sue The Capital Forum, Aurelius Value and Viceroy Research on the basis that these allegations by short sellers were false.

61.     On September 21, 2017, MiMedx issued a press release "announc[ing] [their] interactions with the [SEC]" wherein defendant Petit disclosed that the Company has been "assembl[ing] summary documentation to supply to the SEC, which would include information from the investigation conducted by the Board of Directors and others." Defendant Petit also noted

that the Company had "received a subpoena from the SEC that appears to relate to the former employees' allegations and is primarily related to the matters that were the subject of the Company's previously disclosed internal investigation." Defendant Petit further stated the Company believed "that the government's investigation will confirm our Audit committee's prior findings" and that the Company's "Executive Management team continues to operate MiMedx in a very effective manner[.]"

### THE COMPANY VIOLATES THE PPSA

62.     In addition to the improper revenue scheme, the Individual Defendants caused the Company to engage in another improper scheme. On February 22, 2018, *The Wall Street Journal* published an article titled "MiMedx, Fast-Growing Developer of Tissue Graft Products, Didn't Report Payments to Doctors," detailing MiMedx's alleged history of failing to disclose payments to doctors in violation of 2013's Physician Payments Sunshine Act. Upon reviewing disclosures from doctors, the *Journal* found over 20 doctors who had received payments from MiMedx in recent years.

### THE COMPANY IMPROPERLY LIMITED WOUND TREATMENTS AVAILABLE TO VETERANS ADMINISTRATION AND DEFENSE DEPARTMENT FACILITIES

63.     On October 5, 2018, the *Wall Street Journal* printed an article entitled, "MiMedx Kept Cheaper Products Out of Its Offerings to VA Hospitals." The article discusses how the Company improperly limited wound treatments available to Veterans Administration and Defense Department facilities, forcing increased spending by the government. More specifically, the article states:

> [A]n examination of the embattled company's dealings with Veterans Affairs hospitals and those run by the Defense Department shows that MiMedx's sales to these entities came at a high cost to taxpayers. According to former employees and company product lists, MiMedx limited the range of products it offered to federal buyers, forcing the government to buy more expensive products than it needed for some very common treatments.

***

Former employees say the company's questionable practices toward federal hospitals were more extensive than previously known.

For example, MiMedx had one set of product offerings for federal customers and others for private hospitals and doctors' offices, internal documents show. At Veterans Affairs and Department of Defense hospitals, for example, MiMedx didn't offer the small sizes of two popular products it offered elsewhere; as a result, these accounts had to buy bigger, more expensive offerings for smaller treatments, former employees said.

To treat the smallest wounds, MiMedx offered government hospitals nothing smaller than a 16-millimeter disk-shaped EpiFix graft costing $895. Private hospitals, however, were offered a 14-millimeter disk for $313.

MiMedx marketing materials say the 14-millimeter graft fits more than half of all diabetic foot ulcers, a common wound. Not offering the 14-millimeter graft to federal hospitals increased product waste and raised taxpayers' costs, former employees said.

Federal contractors are supposed to offer government buyers more advantageous pricing than commercial customers receive.

A similar dynamic governs the sales of another MiMedx product, a dehydrated EpiFix injectable. The smallest size offered to federal hospitals is 40 milligrams, costing $725. Private doctors, meanwhile, were offered a 20-milligram unit of EpiFix for $225, internal documents show.

MiMedx declined to comment on these examples. Former employees say government-run hospitals were unaware of the company's pricing practices.

## THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

64. On March 7, 2013, the Individual Defendants issued a press release and filed the same on a Form 8-K with the SEC, entitled "MIMEDX ANNOUNCES 2012 RESULTS," summarizing the financial and operating results for the period ended December 31, 2012. Among other things, the Company's March 7, 2013 press release provided:

**Highlights of 2012 Results include:**

23

Tripling of Revenue over 2011
First full year of positive Adjusted EBITDA
Adjusted EBITDA increased by nearly $9 million
Gross Margins at record level of 81%

**Full Year and Fourth Quarter 2012 Results**

The Company recorded record revenue for the year ended December 31, 2012, with revenue of $27.1 million, more than three times 2011 full year revenue of $7.8 million. Earnings before interest, taxes, depreciation, amortization, impairment of intangibles, earn-out liability and share based compensation (Adjusted EBITDA*) for the year ended December 31, 2012, were $2.4 million, a $8.7 million improvement as compared to the Adjusted EBITDA loss of $6.3 million for the year ended December 31, 2011.

The fourth quarter of 2012 marked the 8th consecutive quarter in which the Company reported improved gross margins. The Company's 2012 gross margins of 81% are nearly a forty-two percentage point improvement over full year 2011 gross margins of 57%.

The Company recorded record revenue for the quarter ended December 31, 2012, with revenue of $10.5 million, an increase of 299% or $7.9 million over fourth quarter of 2011 revenue of $2.6 million, and a 32% increase over the third quarter of 2012. Adjusted EBITDA* for the quarter ended December 31, 2012, were $411,000, a $2.1 million improvement as compared to the Adjusted EBITDA loss of $1.64 million for the quarter ended December 31, 2011.

65.     On March 15, 2013, the Individual Defendants caused the Company to file on Form 10-K with the SEC (the "2012 Form 10-K"), its annual financial results for the period ended December 31, 2012, signed by defendants Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor and Yeston, providing the Company's consolidated financial results for that period (which were previously summarized in the Company's March 7, 2013 press release).

66.     The 2012 Form 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting:

**Item 9A. Controls and Procedures Disclosure Controls and Procedures**
We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Our disclosure controls and procedures are designed to provide reasonable

assurance that information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Annual Report on Form 10K, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d- 15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2012. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework. Our management has concluded that, as of December 31, 2012, our internal control over financial reporting is effective based on these criteria.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of the effectiveness of internal controls over financial reporting to future periods are subject to the risk that the controls may become inadequate.

An evaluation was also performed under the supervision and with the participation

of our management, including our Chief Executive Officer and Chief Financial Officer, of any changes in our internal control over financial reporting that occurred during our last fiscal quarter and that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. That evaluation did not identify any change in our internal control over financial reporting that occurred during our latest fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Cherry, Bekaert & Holland, L.L.P., an independent registered accounting firm, as auditors of our financial statements have issued an attestation report on the effectiveness of the Company's and its subsidiaries' internal control over financial reporting as of December 31, 2012. Cherry, Bekaert & Hollard, L.L.P.'s report is included in this report.

67.    In addition, pursuant to the SOX, the 2012 Form 10-K contained signed certifications ("SOX Certifications") by defendants Senken and Petit, stating that the financial information contained in the Form 10-K was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed. SOX Certifications set forth:

I, [Parker H. Petit/ Michael J. Senken], certify that:

1)  I have reviewed this annual report on Form 10-K of MiMedx Group, Inc.;

2)  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3)  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4)  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in the Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the

registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared,

b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles,

c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation, and

d)  disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

***

The undersigned [Parker H. Petit, the Chief Executive Officer/Michael J. Senken, the Chief Financial Officer] of MiMedx Group, Inc. (the "Company"), has executed this certification in connection with the filing with the Securities and Exchange Commission of the Company's Annual Report on Form 10-K for the year ending December 31, 2011 (the "Report"). The undersigned hereby certifies, to the best of his knowledge, that:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the

Securities Exchange Act of 1934; and

    (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

68.    On May 10, 2013, the Individual Defendants caused the Company to file with the SEC its quarterly report on Form 10-Q for the three month period ended March 31, 2013 (the "1Q2013 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

69.    The 1Q2013 Form 10-Q also assured investors of the effectiveness of the Company's internal control over financial reporting:

**Item 4. Controls and Procedures Disclosure Controls and Procedures**

As required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), we have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. This evaluation was carried out under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer. Based upon that evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our controls and procedures were effective as of the end of the period covered by this report.

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions regarding disclosures.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting that occurred during the three months ended March 31, 2013, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

70.    In addition, the 1Q2013 Form 10-Q contained SOX Certifications, signed by

defendants Petit and Senken, which were substantially similar to those set forth above.

71. On August 8, 2013, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended June 30, 2013 (the "2Q2013 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

72. The 2Q2013 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

73. In addition, the 2Q2013 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

74. On November 8, 2013, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended September 30, 2013 (the "3Q2013 Form 10- Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

75. The 3Q2013 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

76. In addition, the 3Q2013 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

77. On March 4, 2014, the Individual Defendants caused the Company to file on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2013 (the "2013 Form 10-K"), that was signed by defendants Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor and Yeston, and provided, among other things, the

Company's consolidated financial results for those periods.

78.    The 2013 Form 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 56% of the Company's total revenues. Specifically, the 2013 Form 10-K provided, in relevant part:

**Customer Concentration**

We provide products to Government accounts, including the Veteran's Administration, through a distributor relationship with AvKARE, Inc., which is a veteran-owned General Services Administration Federal Supply Schedule Contractor. In 2013, sales to this distributor represented 56% of our revenues. The distribution agreement has a term of three years ending in April 2015, and has the potential to be extended for three additional one year terms. This distribution relationship is different than our other distribution relationships in that our direct sales force calls on Government accounts to generate orders for our products, which are placed directly with the distributor. Thus, if our agreement with this distributor was terminated for any reason, including because this distributor was no longer a Federal Supply Schedule Contractor, we believe we could retain or regain that business by contracting with another distributor to service these government accounts or becoming a General Services Administration Federal Supply Schedule Contractor ourselves. Nevertheless, any disruption in the inclusion of our products on the Federal Supply Schedule for any reason could materially and adversely affect our business, revenues and results of operations.

Another of our distributors represented an additional 10% of our total revenues in 2013. Our current distribution agreement with this distributor has a three year term, expiring in November 2015.

79.    The 2013 Form 10-K also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

80.    In addition, the 2013 Form 10-K contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

81.    On May 12, 2014, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended March 31, 2014 (the "1Q2014 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated

financial results for that period.

82.     The 1Q2014 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

83.     In addition, the 1Q2014 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

84.     On August 11, 2014, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended June 30, 2014 (the "2Q2014 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

85.     The 2Q2014 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

86.     In addition, the 2Q2014 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

87.     On November 10, 2014, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended September 30, 2014 (the "3Q2014 Form 10- Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

88.     The 3Q2014 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

89.     In addition, the 3Q2014 Form 10-Q contained SOX Certifications, signed by

defendants Petit and Senken, which were substantially similar to those set forth above.

90.     On March 13, 2015, the Individual Defendants caused the Company to file on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2014 (the "2014 Form 10-K"), signed by Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor and Yeston, and provided, among other things, the Company's consolidated financial results for those periods.

91.     The 2014 Form 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 34% of the Company's total revenues. Specifically, the 2014 Form 10-K provided, in relevant part:

**Customer Concentration**

In 2014, we provided products to Government accounts, including the Department of Veteran's Affairs, through a distributor relationship with AvKARE, Inc., which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) Contractor. In 2014, sales to this distributor represented 34% of our revenues. The distribution agreement has a term of three years ending in April 2015, but provides a renewal clause for up to two successive terms of one year each following expiration of the initial term. In 2014, we applied for, and in early 2015 received, our own FSS contract with a term through 2020, which will allow us to sell directly to governmental accounts.

92.     The 2014 Form 10-K also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

93.     In addition, the 2014 Form 10-K contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

94.     On May 1, 2015, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended March 31, 2015 (the "1Q2015 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated

financial results for that period.

95.     The 1Q2015 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

96.     In addition, the 1Q2015 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

97.     On August 7, 2015, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended June 30, 2015 (the "2Q2015 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

98.     The 2Q2015 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

99.     In addition, the 2Q2015 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

100.    On November 6, 2015, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended March 31, 2015 (the "3Q2015 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

101.    The 3Q2015 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

102.    In addition, the 3Q2015 Form 10-Q contained SOX Certifications, signed by

defendants Petit and Senken, which were substantially similar to those set forth above.

103.   On February 29, 2016, the Individual Defendants caused the Company to file on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2015 (the "2015 Form 10-K"), signed by Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor and Yeston, and provided, among other things, the Company's consolidated financial results for those periods.

104.   The 2015 Form 10-K further reported that distribution through its distribution agreement with AvKare accounted for 24% of the Company's total revenues. Specifically, the 2015 Form 10-K provided, in relevant part:

**Customer Concentration**

The Company provides products to Government accounts, including the Department of Veteran's Affairs, through a distributor relationship with AvKARE, Inc. ("AvKARE"), which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) Contractor. In addition, in 2014, the Company applied for, and in early 2015 received, its own FSS contract with a term through 2020, which allows the Company to sell directly to Government accounts. The initial term of the distribution agreement with AvKARE was due to expire in April 2015 but it has been extended via amendment through June 30, 2017, with the ability to further extend under certain circumstances. The agreement with AvKARE, as amended, allows the Company to sell its products directly on the FSS. Ultimately, the Company intends to transition all of its Government sales to sales sold directly to Government accounts on the FSS. In 2015, sales to AvKARE represented approximately 24% of total revenue.

105.   The 2015 Form 10-K also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

106.   In addition, the 2015 Form 10-K contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

107.   On May 10, 2016, the Individual Defendants caused the Company to file on Form

34

10-Q its quarterly report for the three month period ended March 31, 2016 (the "1Q2016 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

108.     The 1Q2016 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

109.     In addition, the 1Q2016 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

110.     On August 2, 2016, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended June 30, 2016 (the "2Q2016 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

111.     The 2Q2016 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those set forth above.

112.     In addition, the 2Q2016 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

113.     On November 8, 2016, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended September 30, 2016 (the "3Q2016 Form 10- Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

114.     The 3Q2016 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures

substantially similar to those set forth above.

115.     In addition, the 3Q2016 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

116.     On March 1, 2017, the Individual Defendants caused the Company to file on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2016 (the "2016 Form 10-K"), signed by Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor and Yeston, and provided, among other things, the Company's consolidated financial results for those periods.

117.     According to the 2016 Form 10-K, MiMedx recognizes revenue on sales of its products as follows:

*Revenue Recognition*

The Company sells its products through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion.

Some of the Company's sales to Government accounts, including the Department of Veterans Affairs, are made through a distributor relationship with AvKARE, which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) contractor. The Company's agreement with AvKARE expires, subject to certain for-cause termination rights, on June 30, 2017. The Company may also elect to terminate the agreement without cause and pay a termination fee to AvKARE as specified in the agreement. Upon termination of the agreement, the parties may mutually agree to extend the agreement or the Company has an

obligation to repurchase AvKARE's remaining inventory, if any, within ninety (90) days in accordance with the terms of the Agreement. At the end of the term, the parties expect AvKARE's inventory to be minimal, based upon AvKARE's obligation to use commercially reasonable efforts to achieve target sales levels over the remaining term of the agreement.

We continually evaluate new and current customers, including our stocking distributors, for collectability based on various factors including past history with the customer, evaluation of their credit worthiness, and current economic conditions. We only record revenue when collectability is reasonably assured. A portion of the Company's revenue is generated from inventory maintained at hospitals or physician's offices.

We make estimates of potential future sales returns, discounts and allowances related to current period product revenue and these are reflected as a reduction of revenue in the same period revenue is recognized. We base our estimate for sales returns, discounts and allowances on historical sales and product return information, including historical experience and actual and projected trend information as well as projected sales returns based on estimated usage and contractual arrangements with AvKARE. These estimates have historically been consistent with actual results.

118.    The 2016 Form 10-K also assured investors of the effectiveness of the Company's

internal control over financial reporting with regard to its accounting for revenue. Specifically, the

Company's Form 10-K provided:

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the "Exchange Act". Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Annual Report on Form 10K, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute

assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d- 15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our reporting and disclosure controls and procedures were not effective as a result of the material weakness in our internal control over financial reporting discussed below.

Changes in internal controls: There were no changes in our internal control over financial reporting as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f) that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Material weakness: In reviewing the Company's tax accounting in preparation for filing this Form 10-K, our management identified a deficiency in our internal control over financial reporting that is described below in Management's Annual Report on Internal Control Over Financial Reporting. Our management has concluded that this deficiency constitutes a material weakness in our internal control over financial reporting related to our accounting for income taxes. This material weakness did not result in a material misstatement of the Company's annual financial statements for the year ended December 31, 2016. However, management concluded that this material weakness, if un-remediated, could have resulted in a material misstatement of the Company's annual or interim consolidated financial statements that would not have been prevented or detected by our internal controls. Accordingly, management determined that this control deficiency constituted a material weakness. We have developed a remediation plan for this material weakness, which is described below.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management, including our principal executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting. Our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on its evaluation, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2016,

due to the material weakness in our internal control over financial reporting related to our accounting for income taxes. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. In reviewing the Company's tax accounting in preparation for filing this Form 10-K, management concluded the Company had a material weakness in the design of our internal control over the tax accounting related to an overstatement of an excess tax benefit which, if undetected could have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016. This was identified during the audit process prior to preparation of the Company's financial statements and, therefore did not result in a material misstatement of the Company's annual financial statements for the year ended December 31, 2016 or any of our previously issued annual or interim consolidated financial statements. This material weakness, if undetected, could have resulted in an understatement of income taxes payable, resulting in a material misstatement of the Company's annual consolidated financial statements that would not have been prevented or detected by its internal controls.

The effectiveness of our internal control over financial reporting as of December 31, 2016 has been audited by Cherry Bekaert LLP, an independent registered public accounting firm, as stated in their report which appears in Item 8 of this Annual Report on Form 10-K.

Remediation Plan: Management has begun implementing a remediation plan to address the control deficiency that led to the material weakness. The remediation plan includes the following:

- Implementing specific review procedures, including the increased involvement of our CFO and Controller as well as the hiring of an internal tax specialist to oversee the work performed by the third - party tax specialists.

- Strengthening our income tax control with improved documentation standards, technical oversight, and training.

When fully implemented and operational, we believe the measures described above will remediate the material weakness we have identified and generally strengthen our internal control over financial reporting. We currently plan to have our enhanced review procedures and documentation standards in place and operating in the first quarter of 2017. Our goal is to remediate this material weakness by the end of the first quarter of 2017, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is operating effectively.

Cherry Bekaert LLP, an independent registered accounting firm, as auditors of our

financial statements have issued an attestation report on the effectiveness of the Company's and its subsidiaries' internal control over financial reporting as of December 31, 2016. Cherry Bekaert LLP's report is included in this report.

119.    In addition, the 2016 Form 10-K contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

120.    On May 1, 2017, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended March 31, 2017 (the "1Q2017 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

121.    The 1Q2017 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting with regard to its accounting for revenue and stated, in relevant part:

**Item 4. Controls and Procedures Disclosure Controls and Procedures**
We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the "Exchange Act". Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Quarterly Report on Form 10-Q, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our

disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d- 15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended, were not effective because of the material weakness in our internal control over financial reporting, as described in Management's Report On Internal Control Over Financial Reporting in Item 9A of our Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 10-K"), which continues to exist as of March 31, 2017.

**Remediation of Material Weakness in Internal Control over Financial Reporting**

The Company took steps during the first quarter of 2017 to remediate its material weakness in internal control over financial reporting related to our accounting for income taxes. In reviewing the Company's tax accounting in preparation for filing the 2016 10-K, management concluded the Company had a material weakness in the design of our internal control over the tax accounting related to an overstatement of an excess tax benefit which, if undetected could have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016.

The Company has made progress implementing activities and improvements to address the control deficiency that led to the material weakness during the first quarter of 2017 which include:

- Implementing specific review procedures, including the increased involvement of our CFO and Controller.

- Beginning the process of hiring of an internal tax specialist to oversee the work performed by the third - party tax specialists.

- Strengthening our income tax control with improved documentation standards, technical oversight, and training.

When fully implemented and operational, we believe the measures described above will remediate the material weakness we have identified and generally strengthen our internal control over financial reporting. The material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. The Company expects to make additional improvements in internal control during the remainder of 2017. Our goal is to remediate this material weakness by the end of the 2017 fiscal year, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is

operating effectively.

**Changes in Internal Control over Financial Reporting**

Other than the efforts discussed immediately above in Remediation of the Material Weakness in Internal Control over Financial Reporting, there was no change in the Company's internal control over financial reporting that occurred during the quarter ended March 31, 2017, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

122.    In addition, the 1Q2017 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

123.    The 1Q2017 Form 10-Q also described the ongoing litigation in the Whistleblower Action as follows:

**Former Employee Litigation**

On December 13, 2016, the Company filed lawsuits against former employees Jess Kruchoski (in the *lawsuit styled MiMedx Group, Inc. v. Academy Medical, LLC, et. al.* in the County Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (the "Florida Action")) and Luke Tornquist (in the lawsuit styled *MiMedx Group, Inc., v. Luke Tornquist* in the Superior Court for Cobb County, Georgia, which was removed to the United States District Court for the Northern District of Georgia (the "Georgia Action")). Both the Florida and Georgia Actions assert claims against Messrs. Kruchoski and Tornquist that each of them violated their restrictive covenants entered into with the Company, that each of them misappropriated trade secrets of the Company, that each of them tortiously interfered with contracts between the Company and its customers and employees and that each of them breached his duty of loyalty owed to the Company, among other claims.

On December 15, 2016, Messrs. Kruchoski and Tornquist filed a lawsuit in the United States District Court of Minnesota (the "Minnesota Action") against the Company and the Company's Chairman and Chief Executive Officer, Parker Petit. The plaintiffs in this lawsuit each claimed that their employment with the Company was terminated in retaliation for their complaints about the Company's alleged business practices in violation of the Dodd-Frank Act, 15 U.S.C. § 78u- 6(h); and was an unlawful discharge in violation of Minnesota Statutes Section 181.931 subdivision 1. Mr. Kruchoski also claimed that the termination of his employment with the Company constituted marital status discrimination and familial status discrimination in violation of the Minnesota Human Rights Act. Messrs. Kruchoski and Tornquist also claimed that Mr. Petit tortiously interfered with their employment relationships with the Company.

On January 26, 2017, the Company and Mr. Petit filed motions to dismiss the Minnesota Action. In response, Messrs. Kruchoski and Tornquist voluntarily dismissed the Minnesota Action without prejudice on February 7, 2017. On February 7, 2017, Mr. Tornquist filed his Answer and Counterclaims in the Georgia Action wherein he asserted claims similar to those he had asserted in the Minnesota Action, with the exception that he did not include a claim of tortious interference against Mr. Petit. On February 13, 2017, the Judge in the Georgia Action entered a Consent Order enforcing the restrictive covenants against Mr. Tornquist. On February 27, 2017, the Judge in the Florida Action entered a Consent Order enforcing the restrictive covenants against Mr. Kruchoski.

On February 15, 2017, Mr. Kruchoski filed a new lawsuit in Georgia against MiMedx and Mr. Petit, making many of the same allegations in that suit as were made in the Minnesota suit, with the addition of claims against the Company and Mr. Petit for defamation. In March, MiMedx and Mr. Petit both filed motions to dismiss Mr. Kruchoski's claims, which motions are currently pending, arguing, among other things, that the claims should be brought in the Florida Action.

On December 29, 2016, MiMedx also initiated an action against former employee Mike Fox in the United States District Court for the Northern District of Illinois alleging breach of contract with respect to his restrictive covenants, breach of his duty of loyalty, breach of his fiduciary duty and for the return of certain MiMedx property.

On December 30, 2016, MiMedx initiated a lawsuit against former employee Harold Purdy and his company, Recon Medical Devices, LLC in the Texas state district court for Dallas County alleging breach of Mr. Purdy's restrictive covenants, breach of Mr. Purdy's duty of loyalty, conspiracy to breach other employees' duties to MiMedx, tortious interference, and misappropriation of trade secrets. Mr. Purdy has a pending counterclaim against MiMedx alleging breach of contract.

The Company continues to vigorously pursue its claims asserted in all of these actions and also to vigorously defend against the lawsuits and counterclaims asserted against it.

124.    Notably, the 1Q2017 Form 10-Q did not inform investors that the Whistleblower Action had alleged that the former employees had "discovered a fraudulent revenue recognition scheme orchestrated by MiMedx's executive leadership, including MiMedx's CEO, Parker Petit. MiMedx employed this fraudulently revenue recognition scheme to artificially inflate quarterly revenue and deceive investors."

125.    On July 31, 2017, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended June 30, 2017 (the "2Q2017 Form 10-Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

126.    The 2Q2017 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting with regard to its accounting for revenue by incorporating "Controls and Procedures" disclosures substantially similar to those above.

127.    In addition, the 2Q2017 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

128.    On October 31, 2017, the Individual Defendants caused the Company to file on Form 10-Q its quarterly report for the three month period ended September 30, 2017 (the "3Q2017 Form 10- Q"), signed by defendant Senken, providing, among other things, the Company's consolidated financial results for that period.

129.    The 3Q2017 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting with regard to its accounting for revenue by incorporating "Controls and Procedures" disclosures substantially similar to those above.

130.    In addition, the 3Q2017 Form 10-Q contained SOX Certifications, signed by defendants Petit and Senken, which were substantially similar to those set forth above.

131.    On January 8, 2018, the Individual Defendants issued a press release entitled "MiMedx Releases Preliminary 2017 Revenue of $324.5 Million representing a 32% increase over 2016," and filed the same on Form 8-K with the SEC disclosing, among other things, the Company's preliminary fourth quarter and full year 2017 financial results. The Company's January 8, 2018 press release provided, in relevant part:

**Fourth Quarter 2017 Preliminary Revenue of $90.9 Million Surpasses upper Range of Q4 guidance by Nearly $3 million**

Marietta, Georgia, January 7, 2018, (PR Newswire) -- MiMedx Group, Inc. (NASDAQ: MDXG), the leading biopharmaceutical company developing and marketing regenerative and therapeutic biologics utilizing human placental tissue allografts with patent-protected processes for multiple sectors of healthcare, today announced preliminary record revenue results for the fourth quarter and full-year 2017 and revenue expectations for the first quarter of 2018.

**Fourth Quarter 2017 Revenue Highlights**

- **Q4 2017 revenue of $90.9 Million grew 30% over Q4 2016 revenue and exceeded upper end of guidance by nearly $3 million**
- **Excluding divested subsidiary, Stability Biologics, Q4 2017 revenue grew by 34% over Q4 2016**
- **Q4 2017 Wound Care revenue grew 27% over Q4 2016**
- **Surgical, Sports Medicine and Orthopedics (SSO) revenue for Q4 2017 grew 40% over Q4 2016**

**Full-Year 2017 Revenue Highlights**

- **Full-year 2017 revenue of $324.5 million increased 32% over full year 2016 and exceeded upper end of guidance**

- **Excluding divested subsidiary, Stability Biologics, full-year 2017 revenue grew by 36% over 2016**

- **Full-year 2017 Wound Care revenue of $238.3 million increased by 30% over 2016**

- **Full-year 2017 SSO revenue of $86.2 million grew 41% over 2016**

The Company recorded preliminary record revenue for the year ended December 31, 2017 of $324.5 million, a $79.5 million or 32% increase over 2016 revenue of $245.0 million. The Company recorded record revenue for the 2017 fourth quarter of $90.9 million, a $21.0 million or 30% increase over 2016 fourth quarter revenue of $69.9 million.

**Management Commentary**

Parker H. "Pete" Petit, Chairman and CEO stated, "The fourth quarter of 2017 makes 28 consecutive quarters of sequential revenue growth and 27 of 28 quarters of meeting or exceeding our revenue guidance. At the end of November, we expected we would exceed our revenue forecast for the quarter, as we indicated in our press release on November 30, 2017. We forecasted December to be a solid

growth month, and our sales force more than lived up to our expectations with a robust month to close out the year. We are entering 2018 with strong momentum that should produce an exciting 2018."

Bill Taylor, President and COO, noted, "Contributing to our accelerating sales momentum is the market growth we have achieved with our refined territory analytics for the larger markets and our effective secondary market strategy. The significant prospects for Venous Leg Ulcer (VLU) reimbursement coverage being added during 2018 as a result of the publication of the compelling results confirming the clinical efficacy of EpiFix® in the treatment of VLUs, will further fuel this momentum. As we stated earlier, with our current breadth of commercial carrier reimbursement coverage primarily for Diabetic Foot Ulcers (DFUs), we expect our 2018 Wound Care growth to be aided by our ability to ultimately achieve over 100 million additional commercial lives having EpiFix coverage for the treatment of VLUs."

"Both of our sales verticals had strong performances during the fourth quarter. Wound Care performed extremely well in the fourth quarter with 27% growth over the prior year's fourth quarter, and SSO revenue grew significantly over 2016 with 40% quarter over quarter growth. Fourth quarter revenue from our direct sales force represented approximately 95% of total revenue, and revenue from distributors and Original Equipment Manufacturers (OEMs) accounted for less than 5% of total fourth quarter revenue," Taylor added.

132.    The statements above were each materially false and misleading when made because they failed to disclose and misrepresented adverse facts known by the Individual Defendants. Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that (i) MiMedx was engaged in a "channel-stuffing" scheme designed to inappropriately recognize revenue that had not yet been realized; (ii) the Company lacked adequate internal controls over financial reporting; and (iii) that as a result of the foregoing, MiMedx's publicly disseminated financial statements were materially false and misleading.

THE TRUTH IS REVEALED

133.    On February 20, 2018, MiMedx issued a press release entitled "MiMedx Postpones Release of its Fourth Quarter and Fiscal Year 2017 Financial Results" and filed the same on Form 8-K with the SEC, in which they disclosed, among other things, that "[t]he Audit Committee of

MiMedx's Board of Directors has engaged independent legal and accounting advisors to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company. Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts" stating in pertinent part:

**MiMedx Postpones Release of its Fourth Quarter and Fiscal Year 2017 Financial Results**

**Marietta, Georgia**, February 20, 2018 -- MiMedx Group, Inc. (NASDAQ: MDXG), a leading developer and marketer of regenerative and therapeutic biologics, today announced that it will postpone the release of its financial results, as well as the filing of its Form 10-K, for the year ended December 31, 2017.

The Audit Committee of MiMedx's Board of Directors has engaged independent legal and accounting advisors to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company. Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts.

The Audit Committee is  working closely with its advisors to complete this investigation in as timely a manner as possible. The Company will not be in a position to release its financial results until the Audit Committee's internal investigation is completed.

The Company believes, based on information available to date, that the outcome of such investigation should not have a material impact on revenue guidance for 2018. The Company's unaudited cash and cash equivalents as of December 31, 2017 were approximately $33 million, after giving effect to the use of approximately $24 million for share repurchases in the fourth quarter of 2017 as part of the Company's Share Repurchase Program. The Company had no debt outstanding as of December 31, 2017. The Company also does not expect this delay to affect its operational performance and clinical research activities.

"Our Board of Directors and executives believe it is in the best interests of our Company and shareholders for our Audit Committee to address these allegations in an internal investigation with the support of independent legal and accounting advisors. We look forward to releasing our 2017 financial results as soon as this process is complete," said Parker H. "Pete" Petit, Chairman and CEO. "MiMedx has been experiencing rapid growth over the last few years as our product portfolio continues to meet significant, unmet needs in the marketplace. We are literally saving lives by saving limbs, and we expect to continue to deliver operational and

clinical success in the months and years to come."

134.    On this news, MiMedx's share price plunged more than 39% to close at $8.75 on February 8, 2018, from its previous close of $14.47.

135.    On February 26, 2018, *Bloomberg* published an article disclosing that the DOJ was investigating whether the Company had over overcharged the federal government and had engaged in a channel-stuffing scheme. The very scheme that the Individual Defendants had repeatedly denied and about which they conducted a sham investigation.

136.    On March 15, 2018, the Company issued a press release admitting to the DOJ and SEC investigations.

137.    On June 7, 2018, MiMedx issued a press release stating that the Audit Committee had concluded:

> that the Company's previously issued consolidated financial statements and financial information relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015 and 2016 and each of the interim periods within such years, along with the unaudited condensed consolidated financial statements included in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017 should be restated, and therefore, such consolidated financial statements and other financial information, any press releases, investor presentations or other communications related thereto should no longer be relied upon. Additionally, as a result of the foregoing, all communications and financial information with respect to the fourth quarter of 2017 and the first quarter of 2018 should no longer be relied upon, and the Company is further withdrawing all prior financial guidance issued for 2018.

> ***

> The determination to restate was based on investigation results to date, which have primarily been focused on the accounting treatment afforded to such sales and distribution practices for two distributors which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods.

138.    The June 7, 2018 press release continued: "The accounting misstatements will also require adjustments to the periods in which such revenues were recognized so that such revenues

for products sold are recognized in the period in which such amounts are actually collected," and as a result the Audit Committee was going to investigate again.

139.    Shockingly, the June 7, 2018 press release also stated that both defendants Senken and Cranston were no longer with the Company effective June 6, 2018.

140.    On this news, MiMedx's share price fell $1.92 from previous day closing price, or more than 23%, to close at $6.29 on June 7, 2018.

141.    On June 11, 2018, *Bloomberg* published an article regarding defendant Petit, discussing his role at previous companies he had worked with, stating, "[i]n interviews, 19 current and former executives and employees of his companies describe a hard-charging leader—one who didn't dwell on the rules as he pursued revenue growth, according to about a dozen of them."

142.    The *Bloomberg* article further discussed defendant Petit in connection with the Company, stating:

> More than a half-dozen former MiMedx employees interviewed by Bloomberg, who requested anonymity, said they saw little upside to flagging any potential misconduct while working there, an understanding that flowed from what they called an us-vs.-them culture nurtured by Petit. Several of them noted that while Petit has publicly encouraged workers to write "Dear Pete" letters reporting wrongdoing, he created a culture internally in which workers were reluctant to criticize practices.

143.    On July 2, 2018, MiMedx issued a press release announcing that defendant Petit had resigned as Chairman and CEO but that he would still serve as a member of the Board. Similarly, MiMedx disclosed that defendant Taylor had resigned as President, COO, and as a member of the Board.

144.    Approximately two weeks later, the July 23, 2018 WSJ Article was released discussing the Company's channel-stuffing scheme.

145.    On July 26, 2018, MiMedx announced that it had received a letter from NASDAQ

notifying it that its stock could be delisted as a consequence of its failure to file timely SEC filings.

146.     On August 31, 2018, MiMedx announced that its failure to file timely periodic reports with the SEC had resulted in the termination of a longstanding credit line with Bank of America.

147.     On September 20, 2018, MiMedx announced that both the Board and the Compensation Committee had decided to change the resignations of defendants Petit, Taylor, Senken, and Cranston to "terminations 'for cause.'" The Company also disclosed that the Compensation Committee has taken "all required action to cause all equity and incentive awards outstanding under the Plans held by the Separated Employees to be forfeited. The Board and Compensation Committee action was based on findings that the Separated Employees engaged in, among other things, conduct detrimental to the business or reputation of the Company." The Company further disclosed that the Compensation Committee would initiate a process to get an undisclosed amount of compensation back from defendants. The Company finally disclosed that defendant Petit was no longer a member of the Board effective immediately.

148.     On November 7, 2018, the Company filed an 8-K with the SEC announcing that its stock was suspended from the NASDAQ.

149.     Following this news, on November 8, 2018, the Company continued to trade on the "over the counter" market operated by the OTC Markets Group Inc. (the "OTC Market"). However, on the news of the delisting, from November 6, 2018 to November 8, 2018 MiMedx's stock price fell from $6.28 to $2.95, a drop of more than 53%.

150.     In a Form 8-K filed with the SEC on December 7, 2018, the Company disclosed that EY informed the Audit Committee on December 4, 2018, that EY was resigning from the engagement to audit the Company's consolidated financial statements for the years ended

December 31, 2017 and 2018, effective immediately, The Form 8-K stated that EY had a "disagreement" with certain members of the Company's prior senior management who were subsequently separated from the Company "for cause" regarding "revenue recognition under certain distributor contracts."

151.    On May 23, 2019, the Company announced that the investigation by the Audit Committee investigation had finished with the following conclusions:

a) In connection with the Investigation, King & Spalding and KPMG have reviewed over 1.5 million documents to date, including, but not limited to, emails, text exchanges and other electronic and hard-copy records. In addition, they reviewed significant amounts of data housed in the Company's accounting, customer relationship management, inventory and other systems. They also have reviewed over 2,750 hours of video derived from a secret video surveillance system installed at the direction of Parker H. "Pete" Petit, the Company's former Chairman and Chief Executive Officer, as well as telephonic recordings captured without the consent of all conversation participants.

b) The Investigation found evidence that demonstrated, among other things, that former members of senior management, including Mr. Petit, the Company's former Chief Operating Officer, William C. Taylor, the Company's former Chief Financial Officer, Michael J. Senken, and the Company's former Controller, John Cranston, were aware of the Company's course of dealing with its largest distributor and that this course of dealing was inconsistent with the explicit terms of the contract. Former members of senior management were also aware that this course of dealing included detailed procedures, established as early as 2012, to determine when the distributor would pay for the Company's products.

c) The Investigation uncovered other conduct that appears to have been designed to manipulate the timing and recognition of revenue. This conduct included:

- a distributor was given a lucrative consulting agreement simultaneous with a large purchase near the end of a reporting period;

- instances of intentionally shipping types and volumes of product that were not needed by the customer and recording revenue, typically near the end of a reporting period, and facilitating such sales by agreeing at the time of shipment to allow customers to return or exchange these products in subsequent accounting periods without recording specific provisions for such return or exchanges;

51

- the booking of a large end of quarter sale to a distributor that the Company was in the process of acquiring and for which the Company never received payment;

- several "side deals" with distributors and other customers, whereby the purchasers agreed to take product but were not required to pay for the product until the purchasers were successful in re-selling the product; however, the Company recorded revenue at the time of shipment rather than when the purchasers were obligated to pay, which was inconsistent with GAAP; and

- in at least one instance, Mr. Taylor concealed such a side deal from the Company's Finance and Accounting group. In late 2015, Mr. Taylor forwarded to Messrs. Senken and Cranston a significant purchase order from an international distributor that provided for 180-day payment terms. Shortly after doing so, Mr. Taylor sent the distributor an email stating that if the distributor was unable to resell the product as expected, MiMedx would grant extended payment terms, assist the distributor with reselling the product or repurchase the product from the distributor. Mr. Taylor did not inform Messrs. Senken or Cranston about this side deal, and as a result MiMedx improperly recognized $2.5 million in revenue from this sale near the end of the fourth quarter of 2015.

As a result of these and related activities, the Company recognized revenues in the wrong accounting periods, and in certain instances, improperly recognized revenue altogether. In certain of the situations outlined above, the timing and improper recognition of revenue allowed the Company to meet its published guidance. Absent these apparent revenue management activities, the Company's results would have fallen short of guidance in these periods.

d) The Investigation found that the evidence demonstrated that after questions began to be raised regarding the Company's accounting practices, Messrs. Petit, Taylor, Senken and Cranston made material misstatements and omissions about the Company's course of dealing with its largest distributor, as well as the Company's corresponding revenue recognition practices, to a number of key stakeholders and regulators, including the Division of Corporation Finance of the U.S. Securities and Exchange Commission (the "***SEC***"), the Board, the Audit Committee and the Company's outside auditors. These included:

- After Mr. Cranston's predecessor questioned the Company's accounting for revenue from its largest distributor, Messrs. Petit, Taylor, Senken and Cranston did not disclose to the Audit Committee or the Company's outside auditors that the Company routinely issued credits to the distributor for lost, damaged or missing tissues, nor did they disclose that the distributor only paid the Company for a tissue after it had sold that tissue to its customer.

- On multiple occasions, Messrs. Petit, Senken and Cranston signed letters to the Company's outside auditors misrepresenting that the Company had no side deals or other arrangements that had not been disclosed to the outside auditors.

- In November 2016, after two former employees alleged that the Company had engaged in channel stuffing and improper revenue recognition practices, Messrs. Petit and Senken signed a letter to the Company's outside auditors misrepresenting that they had no knowledge of any allegations of fraud affecting the Company made by current or former employees.

- In early 2017, after the Audit Committee had retained counsel to investigate the allegations made by these former employees, Mr. Petit forwarded to the Board a set of written responses in which counsel for the Company's largest distributor explicitly stated that it only paid the Company for tissues after receiving payment from the distributor's customer. Mr. Petit misled the Board about the accuracy of the information provided by the distributor's counsel.

- Also in early 2017, the Company retained an outside expert to opine on the appropriateness of the Company's recognition of revenue from sales to its largest distributor. Messrs. Petit, Senken and Cranston made misrepresentations to the expert concerning the actual course of dealing between the Company and its largest distributor.

- In early 2017, in letters signed by Mr. Senken, the Company responded to comment letters received from the SEC's Division of Corporation Finance by misrepresenting that the Company's largest distributor was obligated to pay the Company, regardless of whether the distributor resold the product. As noted above, the Company routinely issued credits to the distributor for lost, damaged and missing tissues and received payments from the distributor based on the tissues purchased by the distributor's customer.

- In early 2018, the Company's former senior management prepared a misleading memorandum to the Company's outside auditors that misrepresented key facts regarding the Company's historical relationship with its largest distributor, which were relevant to determining the appropriate revenue recognition under GAAP.

- During a deposition, Mr. Petit falsely testified under oath that it was not true that the Company's largest distributor only paid the Company after the distributor had received a purchase order from its customer.

e) Further, the Investigation determined that the evidence demonstrated that Messrs. Petit and Taylor engaged in a pattern of taking action against employees

who raised concerns about the Company's practices, without conducting a thorough investigation of those concerns. Instead, Messrs. Petit and Taylor focused on disputing the employees' allegations and on seeking to discredit or find wrongdoing by the persons raising the concerns that would justify re-assignment, discipline or termination. For example, after certain employees made allegations of improper accounting practices in late 2016, Mr. Petit directed and oversaw an internal investigation dubbed "Project Snow White" that focused on potential wrongdoing by these employees, rather than the merits of their allegations. As part of Project Snow White, the secret video surveillance system referenced above was installed at Mr. Petit's direction to record interviews that he, Mr. Taylor and other former members of management conducted of certain employees and those employee's discussions amongst themselves without those employees' knowledge or consent. The evidence showed that Mr. Petit directed that certain employees, whom he and other former members of senior management perceived to hold loyalty to an employee who had raised concerns about the Company's practices, be terminated.

f)   Finally, the Investigation found that based on former members of senior management's involvement in the findings outlined above, the evidence demonstrated that these individuals set an inappropriate "tone at the top." The evidence identified a recurrent trend in which former senior management emphasized short-term business goals over compliance and ethics, was not receptive to employee concerns and failed to respond appropriately to compliance issues. In particular, the Investigation's findings on poor tone set by former senior management included evidence demonstrating:

- Former senior management disregarded revenue recognition rules under GAAP and directed others to take actions that caused the Company to take actions that caused the Company to improperly recognize revenue under GAAP, which was a key factor in the Audit Committee concluding it was necessary to restate the Company's financials, as described above.

- Former senior management was involved in conduct that appears to have been designed to manipulate the timing and recognition of revenue—in some instances where the improper recognition of revenue allowed the Company to meet its published guidance.

- After questions began to be raised regarding the Company's accounting practices, former senior management made material misstatements and omissions to a number of key stakeholders and regulators, including the SEC's Division of Corporation Finance, the Board, the Audit Committee and the Company's outside auditors.

- Former senior management engaged in a pattern of taking action against employees who raised concerns about the Company's practices.

- Former senior management overrode internal controls that otherwise might have mitigated certain issues identified in the Investigation. These included former senior management personally overseeing, outside of the Company's normal control processes, the Company's relationship with certain health care providers.

- Former senior management marginalized the Company's legal and accounting departments and outside legal and accounting advisors, by dismissing or ignoring professional advice, withholding information from legal and accounting advisors necessary to appropriately exercise professional judgments and determinations and excluding senior legal and accounting personnel from regular senior management meetings.

152.     On June 3, 2019 the Company filed proxy materials and sent letters to shareholders which announced that defendant Petit had "nominated himself and two of his hand-picked business associates to be elected to the Board at the Annual Meeting. Mr. Petit has also expressed his desire to gain control of the Board."

153.     The Company announced that the letters sent to shareholders stated:

Electing Mr. Petit and his associates to our Board would, we believe, have dire consequences for the Company. Among other things, we believe electing them would damage MiMedx's relationship with its customers, business partners, employees and regulators, and potential sources of capital.

\*\*\*

The unmistakable conclusion reached by the independent investigation and the Audit Committee was that Mr. Petit and certain members of his former management team engaged in serious wrongdoing, including disregarding revenue recognition rules under generally accepted accounting principles; engaging in revenue "management;" making material misstatements to regulators, the Board, the Audit Committee and the Company's outside auditors; taking actions to investigate or silence whistleblowers; and setting an inappropriate "tone at the top."

154.     On June 6, 2019, the Company filed an 8-K with the SEC stating:

- The Board has taken decisive remedial action, including:

    o Determining to recoup compensation from the Company's former Chairman and CEO, Mr. Petit, as well as the Company's former COO, CFO and Controller,

following the completion of the restatement;

- o  Creating an Ethics and Compliance Committee at the Board level;

- o  Hiring a Chief Compliance Officer and implementing plans to ensure compliance and improve internal controls;

- o  Hiring a new CEO; and

- o  Selecting and engaging a new independent auditor.

- • MiMedx's Board is implementing a Board refreshment plan. In cooperation with Prescience Point Capital Management LLC and its affiliates ("Prescience Point"), one of the Company's largest shareholders, the Board has developed a comprehensive plan to refresh its composition. Under the plan, following the 2019 annual meeting, MiMedx Board's ten-person Board would include six new directors. Notably, none of the incumbent directors whose terms expire at the 2018 annual meeting or the 2019 annual meeting of shareholders will stand for reelection. One of the Company's nominees, Dr. M. Kathleen Behrens Wilsey will become Chairwoman of the MiMedx Board upon her election to the Board by shareholders. One of the Board's other nominees, Mr. Newton, is expected to become the new Chairman of the Audit Committee following the 2019 annual meeting.

155.   On this news, from June 5, 2019 to June 6, 2019, MiMedx stock price fell from $5.60 to $4.55, a drop of 18.75%.

156.   On November 26, 2019, it was announced that the U.S. Attorney for the Southern District of New York had criminally charged defendants Petit and Taylor with accounting fraud. Defendants Petit and Taylor face securities fraud charges for allegedly engaging in a scheme to fraudulently inflate the Company's revenue. "As alleged, Parker Petit and William Taylor

deceived the SEC, auditors, and the investing public by repeatedly misrepresenting the financial condition of a publicly traded company," U.S. Attorney Geoffrey Berman said in a statement. "They allegedly conspired, through secret agreements and financial inducements with four distributors, to misstate sales revenue. The alleged conduct resulted in serious criminal charges Petit and Taylor now face."

157.    That same day, the SEC announced that defendants Petit, Taylor, and Senken and the Company itself were named as defendants by the agency for allegedly defrauding investors by misstating the Company's revenue and attempting to cover up their misconduct. The SEC announced that MiMedx had already agreed to pay a $1.5 million penalty to settle the case. The settlement is still subject to court approval.

## DAMAGES TO MIMEDX

158.    As a result of the Individual Defendants' improprieties, MiMedx engaged in the improper schemes describes herein and disseminated improper, public statements concerning MiMedx's operations, prospects and internal controls. This misconduct has devastated MiMedx's credibility, and to date, the Company's common stock has yet to recover.

159.    Additionally, as a direct and proximate result of the Individual Defendants' actions, MiMedx has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

160.    The Securities Class Action, however, is not the only litigation costing the Company money due to the Individual Defendants' wrongdoing. MiMedx is also bearing the costs and expenses incurred from (1) the Whistleblower Action; (2) initiating litigation against the short sellers as described herein even though their reports were merely an outgrowth of the Individual

Defendants' actions;[1] (3) the investigations, lawsuits and/or potential settlements by the DOJ, SEC, VA and Defense Department; (4) the restatements of its financial statements; and (5) costs incurred from the internal investigations of the Audit Committee, the first of which was demonstrated to be a sham investigation.

## DERIVATIVE AND DEMAND ALLEGATIONS

161.    Plaintiff brings this action derivatively in the right and for the benefit of MiMedx to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants.

162.    Plaintiff will adequately and fairly represent the interests of MiMedx and its shareholders in enforcing and prosecuting its rights.

163.    Plaintiff was a shareholder of MiMedx common stock at the time of the wrongdoing of which Plaintiff complains, and has been continuously since.

164.    In accordance with applicable Florida law, on July 20, 2018 Plaintiff's counsel sent a litigation demand (the "Demand")[2] to MiMedx's Board demanding that it investigate the wrongdoing outlined above and in this complaint and bring all appropriate legal action against any offending officer, director, or other person who is found to have committed or participated in the

---

[1] All lawsuits brought by the Company against the short sellers have been dismissed either by MiMedx or by the court.

[2] In the Demand, Plaintiff additionally demanded that MiMedx hold a stockholders' annual meeting. The Company's failure to hold an annual meeting since May 17, 2017, or over a year ago when Plaintiff issued the Demand, violated the Company's own Bylaws and Fla. Stat. § 607.0701 which mandates that all corporations conduct an annual meeting of shareholders. Pursuant to a judgment in a related shareholder lawsuit captioned, *City of Hialeah Employees' Retirement System v. MiMedx Group, Inc.*, Case No. 2019-CA-00263 filed in the Second Judicial Circuit, Leon County of Florida, MiMedx held its 2018 Annual Meeting on June 17, 2019. In another agreement with the *Hialeah* plaintiff, MiMedx had agreed to schedule its 2020 annual shareholders meeting to be held by June 15, 2020. However, the Company on December 16, 2019 filed a Form 8-K with the SEC stating that it will not be in a position to hold its 2019 annual shareholders' meeting by June 15, 2020 as previously announced. Should the Company not holds its 2019 annual meeting in June 2020, Plaintiff will reconsider issuing another demand that MiMedx hold a stockholders' annual meeting pursuant to Fla. Stat. § 607.0701.

wrongdoing described herein. A copy of the Demand is attached hereto and made part hereof as Exhibit A.

165.     On August 2, 2018, Plaintiff's Counsel received a letter ("August 2, 2018 Letter") in response to the Demand stating that the Board had appointed a special committee to evaluate and investigate the allegations and to determine what actions to take in response. A copy of the August 2, 2018 Letter is attached hereto and made part hereof as Exhibit B.

166.     The August 2, 2018 Letter also asked Plaintiff to provide proof of his MiMedx holdings, which Plaintiff promptly provided on September 10, 2018 (the "September 10, 2018 Letter"). In the September 10, 2018 Letter, Plaintiff requested that he be provided any updates to the special committee's investigation and that he be given the names of the members comprising the Special Committee and any Board resolutions passed in connection with the Special Committee. A copy of the September 10, 2018 Letter is attached hereto as Exhibit C.

167.     On September 12, 2018, Plaintiff received a letter stating that the Board had formed a special litigation committee to investigate the Demands and the committee was comprised of defendants Aguilar, Yeston, and Bleser. A copy of the September 12, 2018 letter is attached hereto as Exhibit D.

168.     On October 9, 2018, Plaintiff sent a supplemental demand demanding that the special litigation committee investigate additional allegations revealed by media sources that the Company had purportedly limited wound treatments available to the Veterans Administrations and Defense Department facilities, forcing up spending by the government ("Supplemental Demand" together with the Demand, the "Demands"). A copy of the Supplemental Demand is attached hereto as Exhibit E.

169.     On November 8, 2018, Plaintiff received a letter confirming that the special

litigation committee will likewise investigate the allegations in the Supplemental Demand and that the special litigation committee needed time to conduct and complete a thorough investigation (the "November 8, 2018 Letter). A copy of the November 8, 2018 Letter is attached hereto as Exhibit F.

170.     Despite Plaintiff requesting that he be updated on the special litigation committee's investigation, the special litigation committee in bad faith failed to do so, and remained silent in connection with the Demands for over a year.

171.     On December 2, 2019, Plaintiff sent a letter to the Special Committee requesting an update on the Demands (the "December 2, 2019 Letter"). A copy of the December 2, 2019 Letter is attached hereto as Exhibit G. The December 2, 2019 Letter was prompted by Plaintiff's Counsel having become aware of the special litigation committee having chosen not to pursue claims in other litigation demands that were similar to the Demands. *See* Exhibit G.

172.     Only upon receiving the December 2, 2019 Letter, did the special litigation committee finally give a response to the Demands. Over a month later, on January 31, 2020, Plaintiff received a one-page cursory letter stating that the special litigation committee's investigation is "now complete" and the committee "has determined that it is not in MiMedx's best interest to proceed with any of the claims asserted in the Demand made by [Plaintiff] (the "Refusal"). A copy of the Refusal is attached hereto as Exhibit H.

173.     Thus, despite Plaintiff having asked to be updated regarding the investigation, in good faith giving the special litigation committee ample time to conduct a thorough investigation, and having had waited patiently for a response to the Demands, all of which is in strict adherence to applicable Florida law, the special litigation committee responded with a scant one-page Refusal comprised of three very short paragraphs. *See id.*

174.     The Refusal cannot, in any terms, be considered in good faith. As an initial matter, the special litigation committee is in no way comprised of independent members.

175.     Defendant Bleser lacks independence from defendant Petit as discussed by multiple media sources. For instance, according to a Viceroy Report, defendant Bleser has held "previous positions at other Petit companies: Healthdyne Inc., Healthdyne Information Enterprises (HIE), Healthdyne Maternity Management (HMM) and Matria Healthcare." Due to their longstanding association with one another and because defendant Bleser has received substantial compensation from his various roles at "Petit companies," defendant Bleser is clearly beholden to defendant Petit such that he lacks independence from him.

176.     Additionally, defendant Bleser was a member of the Audit Committee during the Relevant Period that allowed the improper schemes and false financial statements alleged herein and therefore lacks disinterestedness to conduct an impartial investigation because he is implicitly involved in the wrongdoing alleged in the Demands.

177.     Defendant Bleser was also a member of the Audit Committee that conducted a sham investigation into the channel stuffing allegations raised by the former employees and defendant Yeston, as a Board member, approved the conclusions of the Audit Committee's purported investigation. Accordingly, both defendants Bleser and Yeston have already prejudged the claims raised in the Demands and lack the required impartiality to investigate these claims.

178.     Moreover, the Refusal is completely void of any details regarding the investigation conducted by the special litigation committee such as any documents reviewed or interviews performed.

179.     The Refusal also makes no mention of a written report in connection with the special litigation committee's purported investigation of the Demands or its to refuse the Demand.

In failing to produce a report to Plaintiff, the special litigation committee has made it impossible for Plaintiff to review a proper record of the committee's investigation, and to allow Plaintiff and the Court to assess the reasonableness of its methodology in investigating the Demands.

180.     That the Company failed to give Plaintiff any updates to the special litigation committee's investigation and then compounded this failure by failing to give any report by the special litigation committee is an incurable mistake to the refusal of the Demands because there is no adequate record whatsoever of the investigation and recommendation and no evidentiary record upon which to determine whether the Demands were refused in good faith.

181.     In fact, the failure to give a report or any details of the special litigation's investigation is particularly egregious and in bad faith given the Audit Committee's prior sham investigation, the multiple investigations and lawsuits brought against the Company by government agencies as described herein, the criminal charges being brought against defendants Petit and Taylor, and the settlement with the SEC.

182.     Accordingly, the special litigation committee's lack of independence and their bad faith refusal of the Demands falls outside the protection of the business judgment rule and this action should be allowed to proceed.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

183.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.     The Individual Defendants owed and owe MiMedx fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe MiMedx the highest obligation of good faith, fair dealing, loyalty and due care.

185.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

186.    The Individual Defendants had actual or constructive knowledge regarding the improper schemes alleged herein and knowingly and/or recklessly allowed these improper schemes to occur at the Company. In connection therewith, the Individual Defendants also made false and misleading statements regarding the Company's business operations, practices, and internal controls in connection therewith, as alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

187.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, MiMedx has sustained significant and actual damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188.    Plaintiff, on behalf of MiMedx, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Directing MiMedx to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before

shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      C.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      D.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 10, 2020            Respectfully submitted,

*/s/ James L. Davidson*
**GREENWALD DAVIDSON RADBIL PLLC**
James L. Davidson
Alexander D. Kruzyk
7601 N. Federal Highway, Suite A-230
Boca Raton, FL 33487
Telephone: 561.826.5477
jdavidson@gdrlawfirm.com
akruzyk@gdrlawfirm.com

*Local Counsel for Plaintiff*

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes *
Ligaya T. Hernandez *
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (914) 752-3041
Email: mhynes@hh-lawfirm.com
         lhernandez@hh-lawfirm.com

*Counsel for Plaintiff*

* to seek admission *pro hac vice*